# Orr's Appeal.

1. In ordinary cases the payment of money is not necessary to make a contract complete. It is only where the question is whether a future contract was not in contemplation that it becomes of significance.

2. Evidence in this case as to a contract for the sale of interest in a steamer, examined and held insufficient.

3. Brown *v.* Finney, 3 P. F. Smith 373, compared.

November 22d 1870. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Appeal from the decree of the District Court of *Allegheny county:* In Equity: No. 214, to October and November Term 1869.

On the 10th of January 1867, Chambers Orr, administrator, &c., of Turney P. Orr, filed a bill against Hamilton Kelly, setting out:—

1. That the Allegheny Valley Railroad Company and the defendant were, in January 1863, joint owners of the steamboat "Le Claire," in equal shares.

2. That the company offered their interest in the boat for sale for $3000, and the defendant proposed to Turney P. Orr that he (defendant) should purchase the company's interest for $3000, sell to Orr for the same amount and have it transferred to him at the custom-house, Orr to pay him $500 in hand, $1000 April 1st 1863, and the remainder in the months of May and June in the same year.

3 and 4. That on the 21st of January 1863, the defendant and Orr entered into a verbal agreement in accordance with proposition above stated; on the same day, the defendant bought the company's interest in the boat, sold it to Orr upon the terms stated, and promised to have it transferred to Orr on the custom-house books.   Orr paid him the $500, and from that time he was considered by both as the owner of the company's interest.

5. That after the payment of the $500 the parties agreed to go to Kittanning and have their contract reduced to writing by E. S. Golden, Esq., and a due-bill was given by Kelly to Orr as evidence of the payment of the $500, until the writing should be prepared, when it was to be entered on the contract as a credit.

6. Orr went to Kittanning the same day to carry out the arrangement, was taken sick on his arrival there and died on the 8th of February, before the contract could be reduced to writing.

7. That the defendant did not transfer Orr's interest in the boat to him on the custom-house books, but had it transferred to himself on the 22d of January 1863.

8. That the defendant took charge of the steamboat on the 21st of January 1863, and ran her until April 23d 1864, when he sold her for $17,000, and received the purchase-money.

9. That whilst he ran the boat he received her earnings, which were more than sufficient to pay the remainder of the purchase-money due by Orr, after paying the expenses; and that the plaintiff was entitled to receive the one-half of the surplus of the earnings of the boat, and also of the purchase-money; that the defendant refuses to account to the plaintiff or pay him any part of the earnings or purchase-money, alleging that nothing is due to the plaintiff.

The prayers were, that the defendant account and pay over to the plaintiff the decedent's share, and for general relief.

The defendant by his answer denied categorically all the material parts of the bill, especially that there had been any contract or sale in relation to the "Le Claire."   He admitted that he had given Orr a due-bill for $500, but averred that it had been given for his services as clerk on the "Le Claire," the defendant having been the captain.

The plaintiff filed a replication, and B. F. Lucas, Esq., was appointed examiner and master.

The testimony that bore directly on the question of the contract of sale was from Robert C. Orr, a brother of the decedent.

He testified that the defendant had proposed to him that he and the decedent should buy the railroad company's interest on the terms and in the manner mentioned in the bill; upon his declining, the defendant requested him to solicit the decedent to do so; he procured an interview between the decedent and the

defendant, who were in negotiation for two or three weeks.  The witness further said :—

\* \* \* " On the morning of the 21st of January 1863, Captain Kelly came to my office; my brother was there; Kelly told him he must have an answer that day whether he would purchase the interest or not, as Mr. Black wanted Captain Kelly to give him an answer that day whether he would take their interest.  He told Turney that if he did not take the company's interest he would sell his; that there were other parties negotiating with the company for their interest, and the company might sell to some parties that would not be pleasant to him.  My brother arranged with Kelly to meet him at the St. Charles at noon, and he would then give him a definite answer; my brother and I went down to dinner, as we both boarded there, and Kelly met us there, and Turney told him he had concluded to take the interest; we all three went in and took dinner together then; after dinner Kelly said he would go down to Mr. Black's office and close the bargain with him; he arranged with Turney to meet him at my office after he went to Mr. Black's office.  The agreement made there was, that the interest was to be bought by Hamilton Kelly, and by him transferred to Turney Orr, on the books of the office at the custom-house.  Turney was to pay him $500 down; there were $1000 to be paid the 1st of April, or $1500 if he could raise it—I believe that was the understanding—and the balance during the spring run was the understanding, and that was generally from April to June; Turney P. Orr was to be the owner, and was the owner of this interest under this arrangement; the understanding was that Turney was to act as clerk on the boat when she commenced running; as my brother and I were going from the hotel to the office we stopped at the Exchange Bank and drew $500 that he had there; I saw him draw the check.  After we left the bank we went to my office, and Kelly came there that afternoon about 3 o'clock, and my brother paid him $500 for the half interest in the steamer 'Le Claire,' upon this contract; I saw the money paid; I counted the $1500 that Kelly was to pay, as the first payment to the company; he asked me to count it and see if it was right; the $500 paid by my brother made a part of this $1500; when Kelly came there that afternoon he said he had purchased the company's interest in the boat from George Black, and was to take him the money that evening before he left his office.

" After he had paid him the money, my brother asked him whether the transfer should not be made on the custom-house books before the boat could be taken out; Kelly told him he would go at any time now and make the transfer on the custom-house books; when my brother paid him the $500, Kelly remarked that there ought to be a contract made, but that he did not know

[Orr's Appeal.]

how to write it, and he had not time, as he had promised to meet
Mr. Black that evening before he left the office—I mean a con-
tract in writing; I suggested that Kelly should give Turney a
due-bill for the $500; Turney was going to Kittanning that even-
ing; he was sick, and when they went to Kittanning they should
get Mr. Golden to draw the contract, and when it was drawn this
due-bill should be credited on it; Kelly told Turney to draw
a due-bill for that amount, which he did, and Kelly signed it ,
the due-bill was given with the understanding I have stated, that
the amount was to be credited on the purchase when the contract
was drawn and signed; about the 1st of December 1862, Kelly
told Turney, in my presence, that whatever money the boat owed
him for salary as clerk, he had better draw out of the funds of
the boat and charge himself with it, that he expected the railroad
company and he would have some difficulty about the boat, as he
had taken it away from Kittanning; my brother did draw the
amount coming to him on the 10th of December 1862, and de-
posited it in the Exchange Bank; I went with him and introduced
him to the teller of the bank, Mr. Brown; he deposited it to his
own credit, and, I think, charged himself with it on the cash-
books of the boat that day; he, as clerk, had the custody of the
funds of the boat—he carried all the money and kept the books;
I think there was a little coming to him after drawing out the
$500—not much, maybe there was $50; he drew out about what
he thought was coming to him; at the time the due-bill was given,
there was nothing said by Kelly about its being given for unpaid
services, and that was not the purpose for which it was given; I
made an examination of the custom-house books, in the city of
Pittsburg, to see if the transfer of this interest had been made;
I found that the transfer had been made to Hamilton Kelly indi-
vidually; it was afterward transferred to three other persons; my
brother left the city the same evening the money was paid—about
an hour after; he went to my sister's or brother-in-law's, Ephraim
Buffington, and got sick; he died on the 8th day of February—
he died suddenly of disease of the heart; after the death of my
brother, I had some conversation with Hamilton Kelly about my
brother's interest in the boat; he proposed to me to resign
my position as treasurer of the railroad, and to take Turney's
interest in the boat, and go on it as clerk; I declined, as I was
not able to go as clerk, or stand steamboating, on account of my
health; this was only a few days after my brother's death—a
short time afterward, inside of a week; in this conversation he
made no allegation that my brother had no interest in the boat;
nothing was said on the subject. * * *

" The understanding was that the purchase and transfer was to
be from the company to Mr. Kelly, and from Mr. Kelly to my
brother.   The transfer from Kelly to my brother was to be made

after the transfer from the company to Mr. Kelly." Witness further said that after the death of his brother, the defendant " asked me if I would not take my brother's interest in the boat, he would give me the same chance of paying for it he had given Turney; he wanted me to take his place." Also that before the $500 had been paid " the whole matter had been agreed upon and settled; I do not remember of anything being said about the contract not being complete until reduced to writing; I think if anything of that kind had been stated by either of the parties I would have remembered it."

There was evidence from other witnesses of occurrences and declarations by the defendant after the 21st of January for the purpose of corroboration, but not as to what took place on that day.

Letters of administration on the decedent's estate were issued April 25th 1865.

The master in his report said, that the denials in the answer were directly responsive to the allegations of the bill charging the making of a contract, and therefore required the testimony of a witness and corroborating circumstances to countervail the denial. He further said:—

" The testimony of Robert C. Orr is as direct and positive as it is possible for the testimony of a witness to be, and, if believed, it would be sufficient to establish a contract in an action at law. It defines all the terms of the contract, and leaves no part of it in doubt."

And after referring to the testimony of the other witnesses and circumstances proved, he added:—

" The positive testimony then of Robert Orr, corroborated by the testimony of Ephraim Buffington and Hunter Orr, together with the other circumstances proved in the cause, in the opinion of the master, do establish the existence of the contract substantially as set out in plaintiff's bill."

He reported that the plaintiff was entitled to the relief prayed for, and recommended that the defendant be decreed to account.

After exceptions by the defendant, the court decreed:—

" That the report of the master be re-submitted to him, with instructions to state an account without prejudice to the rights of either party, upon the questions raised under the pleadings and evidence on the exceptions filed, and thereupon, on the re-filing of the said master's report, and the statement of account between plaintiff and defendant, as made by him, all questions of law and of fact, whether as to the right of the plaintiff to the relief prayed for by him, or to any relief whatever, or whether as to the correctness of the account as stated by the master, be submitted to and passed upon by the District Court in banc for their final decree."

The master accordingly stated an account, finding that there was due to the plaintiff, as administrator, &c., from the defendant $11,820.95.

The defendant filed these exceptions:—

1. That plaintiff has no right to any account, the evidence showing no contract, and if a contract, that the plaintiff has adequate remedy at law.

2. That the account, as reported by the master, is incorrect, and not based upon any principle warranted by the facts as proven in the case.

After hearing, the District Court dismissed the bill.

The plaintiff appealed to the Supreme Court, assigning the decree for error.

*J. H. Hampton* and *H. D. Foster*, for appellant.

*W. S. Purviance* and *S. A. Purviance*, for appellee.

The opinion of the court was delivered, January 16th 1871, by

SHARSWOOD, J.—There is but one question in this cause and that a question of fact. The bill alleged a purchase by the decedent, Turney P. Orr, of an interest of one-half in the steamboat "Le Claire," and as such part-owner called upon the defendant to account for the earnings of the boat and the price for which he had sold it. The answer positively and responsively denied any such contract of purchase. The learned master appointed in the court below, in a very able report, admitting the established rule in equity to be that such an answer must be disproved by two witnesses or by one witness and corroborating circumstances derived *aliunde*, after an elaborate review of the evidence came to the conclusion that the answer was disproved by the testimony of Robert C. Orr, and that his testimony was sufficiently corroborated by other evidence. We do not purpose to go into an examination of this supposed corroboration, because it must be conceded on all hands that if the testimony of Robert C. Orr failed to establish the fact that there was a perfect and complete contract of sale and purchase, the answer has not been disproved. Throwing aside all preliminary conversations and arrangements the purchase if made as alleged was consummated at the office of Mr. Orr, in Pittsburg, on the afternoon of January 21st 1863. There had been a previous interview of the parties at the St. Charles' Hotel on that day, of which Mr. Orr thus speaks: "The agreement made there was that the interest was to be bought by Hamilton Kelly and by him to be transferred to Turney Orr on the books of the office at the custom-house. Turney was to pay him $500 down: there was $1000 to be paid the 1st of April or $1500 if he could raise it. I believe that was the understanding,

and the balance during the spring run was the understanding and that was generally from April to June."

Let us pause here a moment to inquire whether this is such positive testimony as to the terms of the contract as ought to countervail the positive denial of the answer. Was the cash payment on April 1st to be $1000 or $1500? "Fifteen hundred dollars if he could raise it—I believe that was the understanding." He does not state what the parties said. He believed that was the understanding. Could a chancellor decree specific performance upon such evidence? But assuming that Turney Orr was to have the option to pay in cash either $1000 or $1500, according to his ability to raise the money, let us pass to what followed. They went to the Exchange Bank and Turney Orr drew out the sum of $500, which he had there on deposit. "After we left the bank we went to my office and Kelly came there that afternoon about 3 o'clock, I suppose, and my brother paid him $500 for the half interest in the steamer Le Claire upon this contract." Had he stopped there, there might be some reason to say that the contract was complete though its terms were somewhat uncertain. To use a familiar phrase, the payment of the hand-money "clinched the bargain." Of course, the payment of money is not necessary to make a contract complete in ordinary cases. It is only where the question is whether a future contract was not in the contemplation of the parties that it becomes a most significant fact.

It was evidently the turning point in Brown v. Finney, 3 P. F. Smith 373. In that case there was no disagreement as to terms, and if Brown had accepted Finney's check for $16,000, the agreement would have been complete. But Brown said, it made no difference about the check; he would prepare the papers next day. We will see that this case is much stronger than that was. Mr. Orr proceeds: "When my brother paid him the $500, Kelly remarked that there ought to be a contract made, but that he did not know how to write it; and he had not time, as he had promised to meet Mr. Black that evening before he left the office: I mean a contract in writing; I suggested that Kelly should give Turney a due-bill for the $500; Turney was going to Kittanning that evening: he was sick, and when they went to Kittanning they should get Mr. Golden to draw the contract, and when it was drawn, this due-bill should be credited on it; Kelly told Turney to draw a due-bill for that amount, which he did, and Kelly signed it; the due-bill was given with the understanding I have stated that the amount was to be credited on the purchase when the contract was drawn and signed." Is any elaborate argument necessary to prove that the money was not paid on the footing of a contract of purchase? If the understanding of the parties was, that the contract was then and there completed, why was the form of a due-bill resorted to instead of a simple receipt for the money,

[Orr's Appeal.]

which, when the contract was drawn and signed, could be endorsed as a credit upon it? Nothing was said at the time about the due-bill being a memorandum simply as evidence of the payment—strange evidence of a payment indeed it would be. But it is clear, that as Kelly needed the money to enable him to make payment on his purchase of the interest from the Allegheny Valley Railroad Company, Turney Orr agreed to loan him the amount on the faith of a contract about to be made, the principal terms of which had been arranged, upon which he was to make a cash payment, but if on any account the contract fell through, he was to have the money back, and took the due-bill as evidence that Kelly owed it to him. This is the simple common-sense interpretation of the arrangement as detailed by the witness. The nature of the proposed contract confirms it. It was not merely a purchase and sale of the half interest in the boat—not like the alleged contract in Brown *v.* Finney, the purchase and sale of 100,000 bushels of coal, in which, when the price, terms of payment and delivery were agreed upon, all was settled. It was a part of the contract as stated by Mr. Orr that they were to run the boat in partnership. "The understanding was," says he, "that Turney was to act as clerk on the boat when she commenced running." Kelly was then the master—whether he was to continue as such is not stated—or how the master was to be appointed, if they could not agree. Whether any and if any what salary Turney was to draw before a division of the earnings, is not stated. Is it likely that prudent men would go into such an arrangement, without some stipulations as to how the business should be conducted? This was evidently what Kelly meant when he said "that there ought to be a contract made"—not that the contract already made should be reduced to writing. There is nothing in Kelly's subsequent declaration to contradict this view of the matter. He acknowledged, that he had agreed to sell the half of the boat, that Turney was to be part owner, and that they were to run the boat together, that he had bought the interest for Turney and that if he had lived, there would have been no trouble about it, that these were arrangements made between himself and Turney Orr by which they were to run the boat in partnership. There are other points in the case strongly confirmatory of the construction we put upon the evidence. Turney F. Orr died on February 8th 1863, shortly after the interview at which the contract was alleged to be made, yet no letters of administration were taken out upon his estate until April 25th 1865. Of course there was no offer or tender of $1000 or $1500, whichever was the cash payment to be made on April 1st 1863. It was the balance which was to be paid during the spring run from April to June, out of Turney's share of the earnings, as perhaps may be fairly inferred. But this is not all. It may be deduced from

[Orr's Appeal.]

Robert C. Orr's own testimony, that he did not suppose at the time that there was a complete contract, and that his brother had become part owner of the boat.   He says that a few days after his brother's death, Kelly "asked me if I would not take my brother's interest in the boat, and he would give me the same chance of paying for it that he had gave Turney ; he wanted me to take his place."   What would have been the answer of any man of common intelligence to such a proposition if he had supposed the purchase to have been complete?   Surely that he, Kelly, had no right to make such a proposition : to give or sell an interest which belonged to the estate of his deceased brother.   Yet he does not tell us what answer he made to the proposition.   He remarks, " I was not attending to any business of my brother after his death, I believe not."   We conclude that the learned master committed a plain error in the inference of fact he drew from the evidence, and that the decree of the court below was right.

Decree affirmed and appeal dismissed at the costs of the appellant.